UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KRAFT FOODS GROUP, INC.,<br>a Virginia corporation,<br><br>    Plaintiff/Counter-Defendant,<br><br>    v.<br><br>AFS TECHNOLOGIES, INC.,<br>a Delaware corporation,<br><br>    Defendant/Counterclaimant. | Case No. 14 C 5104<br><br>Judge James B. Zagel |

## MEMORANDUM OPINION AND ORDER

Kraft Foods Group, Inc. ("Plaintiff"), a Virginia corporation with its principal place of business in Deerfield, Illinois, brought suit against AFS Technologies, Inc. ("Defendant"), a Delaware corporation with its principal place of business in Phoenix, Arizona. Defendant asserted two counterclaims against Plaintiff. Plaintiff now moves to dismiss Defendant's counterclaims pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim. For the reasons set forth below, Plaintiff's motion is granted in part and denied in part.

## I. BACKGROUND

### A.    The Professional Services Agreement and Amendments

Effective October 1, 2006, Plaintiff's corporate predecessor, Kraft Foods Global, Inc. ("KFG") and Defendant, at the time known as Answer Systems Inc., entered into a written agreement labeled "Professional Services Agreement" ("PSA"). Pursuant to the PSA, Defendant processed KFG's customer contracts and claims by utilizing Defendant's contract and claims processing software. Article 3 of the PSA provided that Plaintiff would pay Defendant a fixed monthly fee for a specified number of claims ("base claim

1

rate") to be processed by Defendant in a given month. Further, the PSA provided an additional fee for each additional claim that exceeded the base claim rate. Under the PSA, the volume of the base claim rate and the fixed monthly price for processing the claims increased annually each year the PSA spanned.

Article 4 of the PSA stated that the agreement would be effective through and including September 30, 2009 "unless terminated earlier by either party" as provided in the contract, and that either could terminate the PSA without cause by providing 90 days written notice ("Early Termination Provisions"). Additionally, Article 19d of the PSA contained a "Non-Exclusivity" clause, which allowed either party from time to time to enter into similar agreements with third parties, which could be the other party's competitor. The PSA also contained an Illinois choice-of-law provision, which dictated that the parties would be governed by Illinois law in the case of a dispute.

KFG and Defendant mutually amended the PSA, effective April 1, 2007, through a written agreement entitled "First Amendment to the Professional Services Agreement" ("First Amendment"). The First Amendment replaced Article 3 of the PSA in its entirety with a new pricing schedule and added new services to be performed by Defendant.

The PSA was again mutually amended, effective November 1, 2007, through a written agreement entitled "Second Amendment to the Professional Services Agreement" ("Second Amendment"). The Second Amendment added another pricing schedule to Article 3 of the PSA for additional claims processing services KFG purchased. Additionally, the Second Amendment adjusted KFG and Defendant's billing and payment schedule.

Effective March 1, 2009, KFG and Defendant again mutually amended the PSA through a written agreement titled "Pricing Addendum" ("Pricing Addendum"). The Pricing Addendum pertained specifically to Defendant's pricing for "ContractPro" software that it provided KFG. The Pricing Addendum states that it replaces any other Amendment pertaining to the pricing of "ContractPro" services.

KFG and Defendant again amended the PSA through a written agreement entitled "Third Amendment to the Professional Services Agreement" ("Third Amendment"), which was effective October 1, 2009. The Third Amendment altered the PSA, the First Amendment, and the Second Amendment by extending the terms of the agreement from October 1, 2009 through September 30, 2012. Additionally, the Third Amendment provided a new pricing schedule for several claims processing services. However, the Third Amendment explicitly stated that the March 1, 2009, Pricing Addendum executed in connection with Defendant's "ContractPro" services remained unchanged.

**B.      The Spin-Off Agreement**

On June 4, 2012, in anticipation of KFG's parent company splitting KFG's operation into two distinct public entities, a "North American grocery" company and a "global snacks" company ("Spin-Off Companies"), the parties again mutually amended the PSA through a series of written agreements entitled "Service Agreement," "Spin-Off Addendum," and "Exhibit A" (collectively referred to as the "Spin-Off Agreement"). The Spin-Off Agreement split the PSA as amended into two separate agreements, one intended for the "North American grocery" spin-off company and Defendant and the other for the "global snacks" spin-off company and Defendant. Further, because KFG's parent company would likely need to take further action in connection with the

bifurcation of KFG's operations, the Spin-Off Agreement allowed for KFG, at its sole discretion, to assign its interest in the separate versions of the PSA to the Spin-Off Companies. Pursuant to the Spin-Off Agreement, KFG assigned its interest to Plaintiff, which is the "North American grocery" spin-off company.

The Spin-Off Agreement set forth all new and modified terms "that replace or supplement, as applicable, terms of the Original Agreement." Among other things, the Spin-Off Agreement set forth a new "Agreement Term" and a new "Flat-Rate Monthly Billing" regime. Under the Spin-Off Agreement, the term of the contract was to last from October 1, 2012 through October 1, 2015. The parties reflected this in the Spin-Off Agreement as follows: "Agreement Term: 10/1/12 through 10/1/15." As for the billing schedule, under the Spin-Off Agreement, Plaintiff paid a flat monthly price based on a projected number of claims that would be submitted each month to Defendant. Additionally, the new pricing scheme allowed for "quarterly true-ups" to account for months in which the volume of claims fell below or exceeded the projected number of claim submissions. If the number of claims submitted fell below the preset base number of claims for the month, then Defendant would credit Plaintiff according to the number of claims that fell below the monthly base rate. Conversely, if the number of claims submitted exceeded the base rate of claims for the month, then Defendant would bill Plaintiff for each additional claim that exceeded the base rate.

The Spin-Off Agreement also purported to incorporate by reference the PSA and all subsequent Amendments to the PSA. In addition, the Spin-Off Agreement contained an integration clause that stated, "This Agreement (including all exhibits, attachments, and POs,) is our entire agreement with respect to its subject matter, and any prior

4

agreements, oral or written, are no longer effective unless incorporated by reference." The Spin-Off Agreement also supplied a conflict provision. The conflict provision stated that if there was a conflict between the Spin-Off Agreement and the PSA, as amended, then the terms of the Spin-Off Agreement would control.

On May 14, 2014, Plaintiff notified Defendant that it was terminating the agreement, effective September 30, 2014. Along with the termination notice, Plaintiff demanded that Defendant return Plaintiff's allegedly proprietary and confidential information that it had gained in connection with the services it performed for Plaintiff. To that end, Plaintiff delivered a proposed "Statement of Work" ("SOW"), which set forth a series of deadlines by which Plaintiff's requested information would be returned. After unfruitful negotiations regarding the return of the information, Plaintiff brought this action against Defendant.

## II. PROCEDURAL HISTORY

Plaintiff filed suit against Defendant on July 9, 2014, alleging breach of contract (Count I), conversion (Count II), and violation of the Illinois Trade Secrets Act (Count IV). Plaintiff sought a declaratory judgment against Defendant (Count III), as well as injunctive relief preventing Defendant from using or retaining Plaintiff's alleged proprietary and confidential information. Defendant responded with two counterclaims, alleging breach of contract (Count I) and fraudulent inducement (Count II). Prior to a preliminary injunction hearing before a magistrate judge, Defendant agreed to turn over the disputed information to Plaintiff. Pursuant to Fed. R. Civ. P. 12(b)(6), Plaintiff now moves to dismiss Defendant's counterclaims for failure to state a claim on which relief can be granted.

## III. LEGAL STANDARD

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) does not test the merits of a claim; rather, it tests the sufficiency of the complaint. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In deciding a 12(b)(6) motion, the Court accepts all well-pleaded facts as true, and draws all reasonable inferences in favor of the non-moving party. *Id.* at 1251. To survive the motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Moreover, when a party alleges fraud, Fed. R. Civ. P. 9(b) requires that the party plead with particularity the circumstances constituting the fraud. Fed R. Civ. P. 9(b); *Rao v. BP Products North America, Inc.*, 589 F.3d 389, 401 (7th Cir. 2009). This means that the party must allege "the who, what, when, where, and how" of the alleged fraud. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).

## IV. ANALYSIS

### A.    Breach of Contract

Under Illinois law, "[t]o properly plead a cause of action for breach of contract, a [party] must allege the essential elements, which are: "(1) the existence of a valid and enforceable contract; (2) performance by [that party]; (3) breach of the contract by the [opposing party]; and (4) resultant injury." *Gonzales v. Am. Exp. Credit Corp.*, 733 N.E.2d 345, 351 (Ill. App. 1st Dist. 2000). "Only a duty imposed by the terms of the contract can give rise to the breach." *W.W. Vincent & Co. v. First Colony Life Ins. Co.*,

814 N.E.2d 960, 967 (Ill. App. 1st Dist. 2004). Defendant argues that Plaintiff breached its contractual obligations by (i) attempting to terminate the Spin-Off Agreement before October 1, 2015, and (ii) intentionally reducing the number of claims it submitted to Defendant.

### 1. Internal Consistency

As a threshold matter, Plaintiff contends that Defendant's breach of contract claim should be dismissed because it failed to plead a material element of the claim when it denied in its Answer to Plaintiff's Complaint, incorporated by reference, that "[t]he Agreement is a valid and enforceable contract." Plaintiff asserts that Defendant's claim is fatally defective because Fed. R. Civ. P. 8(d)(3) does not allow for inconsistencies within a single contract claim. Thus, according to Plaintiff, Defendant "should not be permitted to incorporate a denial that the Agreement is enforceable into a count alleg[ing] breach of the Agreement."

Here, Defendant's denial of the allegation and subsequent incorporation is based on Plaintiff's definition of "Agreement," which included the PSA's Early Termination Provisions. Defendant's breach of contract claim is based on a materially different agreement—the Spin-Off Agreement—that was executed in 2012 and lacks an early termination provision. Defendant is not alleging the Spin-Off Agreement is unenforceable, and its denial that the Agreement is a valid and enforceable contract does not render its claim internally inconsistent.

### 2. Ambiguous Contract Provisions

Plaintiff and Defendant dispute whether two terms of the Spin-Off Agreement (i) prohibited Plaintiff from intentionally reducing the volume of claims it submitted to

Defendant, and (ii) permitted either party, pursuant to the Early Termination Provisions, to terminate the Spin-Off Agreement before October 1, 2015. Both parties contend that their interpretation of the Spin-Off Agreement is the only reasonable interpretation, with Defendant alternatively arguing that at a minimum the contract is ambiguous.

Under Illinois law, the Court's "primary objective in construing a contract is to give effect to the intent of the parties." *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007). To that end, the Court "first look[s] to the plain and ordinary meaning of the contract language." *Aeroground Inc., v. Centerpoint Properties Trust*, 738 F.3d 810, 813 (7th Cir. 2013). "In construing the contract, effect must be given to each clause and word used, without rejecting any words as meaningless or surplusage." *Hufford v. Balk*, 497 N.E.2d 742, 744 (Ill. 1986). The contract must be interpreted "as a whole viewing each part in light of others." *Gallagher*, 874 N.E.2d at 58. Further, "[a] modified contract containing a term inconsistent with a term of an earlier contract between the same parties is interpreted as including an agreement to rescind the inconsistent term in the earlier contract." *Schwinder v. Austin Bank of Chicago*, 809 N.E.2d 180, 189 (Ill. App. 1st Dist. 2004).

Ambiguity in a contract is a question of law for the court. *Joseph v. Lake Michigan Mortg. Co.*, 436 N.E.2d 663, 665 (Ill. App. 1st Dist. 1982). A contract is ambiguous when its language is "reasonably or fairly susceptible to having more than one meaning." *Flora Bank & Trust v. Czyzewski*, 583 N.E.2d 720, 725 (Ill. App. 5th Dist. 1991). Moreover, a contract is ambiguous when the language is "obscure in meaning through indefiniteness or expression." *Wald v. Chicago Shippers Ass'n*, 529 N.E.2d 1138, 1145 (Ill. App. 1st Dist. 1988). A contract is not "ambiguous simply because the parties

do not agree on the meaning of its terms." *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998).

i. **Reduction in Claims**

Defendant alleges that Plaintiff breached the Spin-Off Agreement when it intentionally reduced the number of claims it submitted to Defendant. However, Defendant does not identify any provision within the Spin-Off Agreement that prohibited Plaintiff from doing so. Instead, Defendant argues that the term "Flat" in the Spin-Off Agreement's "Flat-Rate Month Billing" provision would be rendered meaningless if Plaintiff was permitted to intentionally reduce the number of claims it submitted. I find that the Spin-Off Agreement unambiguously contemplated that the volume claims may fluctuate month-to-month and provided a mechanism, "the quarterly true-ups," to reflect such an expectation. Defendant's assertions that Plaintiff made a "promise to process a specific number of claims through [Defendant]" and that the "quarterly true-ups" were for minor involuntary fluctuations in volume is neither memorialized in the Spin-Off Agreement nor any prior agreements incorporated therein. The Spin-Off Agreement set forth an expected number of claim submissions, not a minimum requirement that Plaintiff was obliged to meet. Furthermore, to read a provision into the Spin-Off Agreement that prohibited Plaintiff from reducing the number of claims it submitted would undermine the PSA's "Non-Exclusivity" clause, which both parties agree remained in effect when the Spin-Off Agreement was executed.

The Spin-Off Agreement, in this instance, is subject to only one reasonable interpretation—the Plaintiff's interpretation—and thus is not ambiguous. Defendant's allegation that Plaintiff engaged in conduct resulting in a reduction in claims, taken in the

light most favorable to Defendant, does not constitute a breach of the Spin-Off Agreement.

### ii. Early Termination Provisions

Defendant also alleges that Plaintiff breached the Spin-Off Agreement by attempting to terminate the agreement before October 1, 2015. According to Defendant, the Spin-Off Agreement's "Agreement Term" was intended to rescind the Early Termination Provisions contained in the PSA and that intention was demonstrated through the Spin-Off Agreement's "conflict provision." Plaintiff contends that the "Agreement Term" only extended the term of the Spin-Off Agreement and did not affect any other provisions contained in the PSA, which was incorporated by reference in the Spin-Off Agreement.

The Spin-Off Agreement supplies new and modified terms that "replace or supplement, as applicable" the terms of the prior agreements between the parties. However, the provision does not indicate to what extent the modified terms "replace" or "supplement" the terms incorporated by reference into the Spin-Off Agreement. The only guidance is the term "as applicable," which does not answer whether the parties intended to eliminate the Early Termination Provisions by excluding the language "unless terminated earlier" from the "Agreement Term." Therefore, "Agreement Term" can be reasonably read to merely supplement a new term length for the Spin-Off Agreement, leaving the Early Termination Provisions undisturbed. And the "Agreement Term" can also be reasonably interpreted to replace the Early Termination Provisions, and thereby extinguish the parties' ability to terminate without cause. This conclusion is buttressed by the fact that in prior Amendments to the PSA, the parties in explicit and unambiguous

terms set forth to what extent and which provisions were replaced and supplemented. Because both Plaintiff and Defendant's advance reasonable interpretations of the "Agreement Term" and its effect on the Spin-Off Agreement, the Spin-Off Agreement, in this regard, is ambiguous.

Thus, accepting all-well pleaded facts as true, and drawing all reasonable inferences in favor of Defendant, I find that Defendant has stated a claim for breach of contract. Defendant has alleged facts that show the parties entered into a valid and enforceable contract; that it substantially performed under the terms of the contract; that Plaintiff breached by attempting to terminate prior to October 1, 2015; and that it incurred significant losses caused by Plaintiff's breach. Plaintiff's motion to dismiss Defendant's breach of contract claim is denied.

**B.     Fraudulent Inducement**

In Count II of its counterclaims, Defendant alleges that Plaintiff fraudulently induced it into executing the Spin-Off Agreement. Specifically, Defendant claims that Plaintiff falsely represented that claims-processing business would not be directed away from Defendant to a competitor for three years. Despite this representation, Defendant claims that Plaintiff never intended to uphold its promise because at the time of the alleged misrepresentation Plaintiff was completing a deal to replace Defendant with one of its competitors. As a result of the misrepresentation, Defendant claims that it extended substantial discounts in pricing to Plaintiff and incurred unnecessary costs in connection with the claim processing services it provided. Defendant maintains that it would not have offered discounted pricing had it known Plaintiff planned on replacing it with a competitor.

Under Illinois law, to state a claim for fraud a party must allege: "(1) that the [opposing party] made a statement; (2) of a material nature; (3) which was untrue; (4) known by the person making it to be untrue, or made in culpable ignorance of its truth or falsity; (5) relied on by the victim to his detriment; (6) made for the purpose of inducing reliance; and (7) the victim's reliance led to his injury." *Gen. Elec. Credit Auto Lease Inc.*, *v. Jankuski*, 532 N.E.2d 361, 363 (Ill. App. 1st Dist. 1988). Promissory fraud "is a form of fraud based upon a representation of intent concerning future conduct, e.g., a promise to perform a contract when there is actually no intent to perform the contract." *Id.* at 363—364.

Generally, "promissory fraud, based on future acts, is not actionable in Illinois unless the promise is part of a 'scheme' to defraud." *Id.* at 384 (quoting *Steinberg v. Chicago Medical School*, 371 N.E.2d 634, 641 (Ill. 1977)). Illinois courts have held that a "scheme to defraud requires a pattern of fraudulent statements or one particularly egregious fraudulent statement." *BPI Energy Holdings, Inc., v. IEC (Montgomery) LLC*, 664 F.3d 131, 136 (7th Cir. 2011) (applying Illinois law) (internal quotations and citations omitted). Here, Defendant's claim—that Plaintiff falsely represented that claims would not be migrated away from Defendant for three years—is essentially a claim of promissory fraud because the alleged promise was one concerning Plaintiff's future actions. Plaintiff argues that Defendant's promissory fraud claim does not fit into the recognized exceptions under Illinois law. Furthermore, Plaintiff argues that Defendant's claim is insufficient because it does not conform to the heightened pleading requirements of Fed. R. Civ. P. 9(b).

Setting aside whether the alleged promissory fraud fits an exception Illinois law recognizes, the Defendant has not adequately alleged the "who, what, where, when, and how" regarding the claim of fraud in the inducement. *DiLeo,* 901 F.2d at 627. Rule 9(b) requires a party to state "the identity of the person making the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated." *Camasta v. Jos. A. Bank Clothiers Inc.*, 761 F.3d 732, 737 (7th Cir. 2014). Defendant does allege that prior to executing the Spin-Off Agreement, Plaintiff represented that it would not drive claims to a competitor for three years. But Defendant fails to identify the person who made this representation. Likewise, Defendant does not allege how the misrepresentation was communicated, nor does Defendant allege with any particularity when the alleged misrepresentation was made. Further, Defendant makes no mention of where the alleged communication may have taken place. Consequently, Defendant's claim fails to conform to the requirements of Rule 9(b). *Ritacca v. Storz Med., A.G.,* 291 F.R.D. 176, 179 (N.D. Ill. 2013) (dismissing claim for failure to comply with Fed. R. Civ. P. 9(b)); *U.S. ex rel. Walner v. NorthShore University Healthsystem*, 660 F. Supp. 2d 891, 897—898 (N.D. Ill. 2009) (same). As such, Count II of Defendant's counterclaim is dismissed.

## V. CONCLUSION

For the aforementioned reasons, Plaintiff's motion to dismiss Defendant's counterclaims is DENIED as to Count I for breach of contract and GRANTED as to Count II for fraudulent inducement.

ENTER:

*James B. Zagel*
United States District Judge

DATE: December 5, 2014